Filed 10/5/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TODAY'S IV, INC., | B306197 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS160846) |
| v. | |
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge. Affirmed.

Putterman Yu Wang, Donald J. Putterman, George E. Chikovani; Law Office of Christopher Sutton, Christopher Sutton; Vedder Price, Michelle L. Landry; Esner, Chang & Boyer, Stuart B. Esner, and Kathleen J. Becket for Plaintiff and Appellant.

Mary C. Wickham, County Counsel, Charles M. Safer, Assistant County Counsel, Ronald W. Stamm, Deputy County Counsel; BDG Law Group, Gregory M. Bergman, Richard A. Fond, Matthew R. Hicks, Jason J. Barbato; Remy Moose Manley

and Tiffany K. Wright for Defendant and Respondent Los Angeles County Metropolitan Transportation Authority.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson, and Kristin M. Tannler for Defendant and Respondent Regional Connector Constructors.

———————————

Appellant Today's IV filed a civil complaint against respondents Los Angeles County Metropolitan Transportation Authority and Regional Connector Constructors for their "unreasonable" construction of an underground subway line in downtown Los Angeles, which affected the Westin Bonaventure Hotel and Suites (the Bonaventure), owned by Today's IV. A portion of the construction runs under Flower Street, between 4th and 5th Streets, where the Bonaventure is located.

Today's IV alleged claims for nuisance and inverse condemnation due to 1) respondents' use of the cut-and-cover construction method instead of the tunnel boring machine method; 2) construction work during nights and weekends, which was particularly harmful to the Bonaventure's operation as a hotel; 3) violation of certain noise limits; and 4) interference with access to the Bonaventure. Today's IV alleged lost contracts, including a $3.3 million airline contract, and loss of business. It requested compensatory and punitive damages from respondents.

The trial court found no liability and entered judgment in favor of respondents. Today's IV appealed from the May 15, 2020 judgment in favor of Los Angeles County Metropolitan Transportation Authority and the May 15, 2020 judgment in favor of Regional Connector Constructors.

We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*

Appellant Today's IV, Inc. (Today's IV) owns and operates the Westin Bonaventure Hotel and Suites (the Bonaventure) located in downtown Los Angeles. The Bonaventure includes 1,354 rooms for hotel guests, 35 meeting rooms for conferences and events, restaurants, and a revolving lounge providing 360-degree views of Los Angeles. The Bonaventure occupies the entire city block between Flower and Figueroa Streets and is bounded on the north and south by 4th Street and 5th Street, respectively. The only access to the Bonaventure's parking garage and loading dock are via Flower Street—which is a one-way southbound street with five to six lanes. The Bonaventure's main guest/invitee drop-off and pick-up point is on Flower Street as well; there is limited guest access from Figueroa Street.

The City National Plaza and Towers (CNP), consisting of two office buildings, a pedestrian plaza, and a subterranean garage, occupies the city block between Flower and Figueroa Streets, and is bounded on the north and south by 5th and 4th Streets. CNP has two entrances/exits from its parking garage. FSP-South Flower Street Associates, LLC (FSP) has owned CNP, as well as its J-2 garage, since October 1, 2013.

The Los Angeles County Metropolitan Transportation Authority (Metro) is a local public transportation agency responsible for planning, building, and operating public transit, rail, and other transportation systems within Los Angeles County.

One such public transit infrastructure project undertaken by Metro is the Regional Connector Transit Project (the Project), which—when completed—will directly link the tracks of three

3

Metro rail lines—Metro Gold Line, Metro Blue Line, and Metro Expo Line. The rail connector will run from the 7th Street/Metro Center Station (the terminus of the Metro Blue Line and Metro Expo Line) located at 7th and Figueroa Streets, to the Metro Gold Line near the Little Tokyo/Arts District Station at 1st and Alameda Streets. The Project, when completed, will allow continuous train operations between Long Beach and Montclair and from East Los Angeles and the San Gabriel Valley to Santa Monica without having to transfer subway lines.

Metro selected Regional Connector Constructors (RCC) as the general contractor to build the Project. RCC is a joint venture consisting of Skanska USA Civil West California District, Inc. (Skanska) and Traylor Bros., Inc.

The Project includes construction of a 1.9-mile tunnel to connect the underground subway/public transit system. It also includes three new underground stations in downtown Los Angeles. A portion of the Project runs along and under Flower Street, including between 4th and 5th Streets—exactly where the Bonaventure is located. Plus, vehicle access into the Bonaventure's underground parking garage is available only by means of a single driveway from Flower Street. Thus, the Bonaventure was bound to be affected by construction of the Project, and indeed, the underlying action by appellant Today's IV against respondents Metro and RCC[1] arises from their construction of the Project and its effect on the Bonaventure.

---

[1] We refer to Metro and RCC collectively as respondents.

4

B.     *Environmental Impact Report/Study*

The Project resulted from nearly 20 years of planning and environmental review.  According to a "purpose and need report" prepared for Metro, the Project area is "a major population and employment center for the Los Angeles region, served by extremely congested road networks that will further deteriorate with the projected population growth of 31 percent and employment growth of seven percent . . . by 2035.  The anticipated growth and increase in transit routes to the area will create more crowding, more delays, and longer travel times for riders."  The Project would not only "improve the region's public transit service and mobility" but also would allow for "greater accessibility while serving population and employment growth in downtown Los Angeles."  The Project was "planned with the goal of improving travel times, reducing transfers, reducing traffic congestion, improving air quality, and creating a sustainable light rail transit system that serves people throughout the region as well as in downtown Los Angeles."

In January 2009, Metro completed "an Alternatives Analysis" that evaluated transit mode and alignment alternatives for the Project.  As a result, Metro culled over 30 light rail alternatives to two options.

On September 3, 2010, Metro published a draft "environmental impact report/environmental impact study" (EIR) for the Project for public review and comment.  Metro held two public hearings to receive written and oral testimony from the general public on the draft EIR.  The draft EIR contemplated constructing the subway by using the cut-and-cover technique on Flower Street immediately facing the Bonaventure's east

exterior. The draft EIR also included a third light rail alternative in response to community input.

On July 22, 2011, a supplemental EIR was circulated for public review and comment. Based on comments received and input from community meetings, the Project's design was refined to address environmental impacts.

Metro issued (but did not yet approve) the final EIR in January 2012. Metro held meetings with the Flower Street Business District stakeholders, a group that included Today's IV (as owner of the Bonaventure), FSP (as owner of CNP and J-2 garage), and other landowners or those with commercial interests in the Project area on Flower Street, to discuss all issues related to the construction on Flower Street. Stakeholder meetings held on February 24 and 28, and on March 5 and 9, 2012, included discussions about Metro's decision not to use tunnel boring machine construction on that part of Flower Street. Today's IV attended those meetings.

On April 26, 2012, Metro's Board of Directors (Board) approved the Project and certified the Project's final EIR. The final EIR states it complies with the National Environmental Policy Act (NEPA) and the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq. (CEQA)). The final EIR "defines the alternatives studied and describes each alternative's associated potential transportation and environmental impacts, operating and maintenance and capital costs, and potential funding sources." Potential areas of impact included transit, traffic, parking, land use/neighborhoods, visual quality, air quality, climate change, noise and vibration, geology, exposure to hazardous substances, safety and construction impacts, and "other CEQA determinations."

Chapter 1 of the final EIR presents "the purpose and need for transportation investments" in the Project area. The purpose is to "improve transit travel time and provide more reliable transit service." The Project would not only "improve the region's public transit service and mobility" but also would allow for "greater accessibility while serving population and employment growth in downtown Los Angeles." Chapter 2 summarizes "alternatives considered, including physical features and operating characteristics." Chapter 3 summarizes transportation benefits and impacts of each alternative.

Chapter 4 discusses environmental factors, impacts, mitigation, and specifically, analysis of potential noise and vibration impacts during construction based on applicable standards. The EIR specified that the "noise impact analysis for operation of this project is based on criteria defined in the [Federal Transit Administration (FTA)] Transit Noise and Vibration Impact Assessment" dated May 2006. Some land use types are more sensitive to noise than others; the FTA noise impact criteria classify sensitive land uses into three categories: Category 1 includes buildings or parks where low noise is an essential element of their purpose (e.g., amphitheaters and concert pavilions); Category 2 includes buildings where people normally sleep (e.g., residences, hotels, and hospitals) and nighttime sensitivity is assumed to be of utmost importance; and Category 3 includes institutional land uses primarily in the daytime that depend on low noise as an important part of operations (e.g., schools, libraries, and churches). The FTA Transit Noise and Vibration Impact Assessment sets daytime eight-hour Leq noise limits at 80 decibels (dBA) for residential

land use; 85 dBA for commercial land use; and 90 dBA for industrial land use.[2]

The construction mitigation plan prohibits noise levels generated during construction from exceeding FTA's construction noise criteria.  If a noise complaint is filed during construction on the Project, noise monitoring shall be conducted in the vicinity of the area in question.  If monitored noise levels exceed FTA construction noise criteria, the contractor "shall use" all or a combination of mitigation measures NV-13 through NV-17 to reduce construction noise levels to meet FTA construction noise criteria

Chapter 6 of the EIR addresses each alternative's cost and financial feasibility, while Chapter 9 summarizes responses to comments received on the draft EIR and supplemental EIR. Chapter 10 sets out "additional CEQA analysis."

Metro's Board also adopted a Mitigation and Monitoring Report Program (Mitigation MRP) in the EIR to govern the methods of Project construction and to mitigate identified potential negative environmental, traffic, and transit impacts from the Project.  The final EIR identifies 21 measures to mitigate impacts of the alternatives.  For our purposes, we will review mitigation measures TR-1, CN-3, CN-5, and DR-5.

---

[2]     The EIR provides: "In an urban setting, a change of 1 [dBA] or less is generally not detectable by the human ear while a change of 3 dBA will be noticeable to most people.  A change of 5 dBA is readily perceived.  A change of 10 dBA, up or down, is typically perceived as a doubling or halving of an urban noise level, respectively."

8

Mitigation measure TR-1 provides: "*Prior to the initiation of localized construction activities, a traffic management and construction mitigation plan shall be devised.* The closure schedules in the construction traffic plan *shall be coordinated* to minimize impacts to residences, businesses, special events, and traffic flow. During these times, traffic shall be re-routed to adjacent streets via clearly marked detours. . . . *Access to adjacent businesses shall be maintained at all times during business hours, and to residences at all times.*" (Italics added.)

Mitigation measure CN-3 provides: "*Traffic management and construction mitigation plans shall be developed in coordination with the community* to minimize disruption and limit construction activities during special events. *Worksite Traffic Control Plans shall be developed in conjunction with* [the Los Angeles Department of Transportation] and *surrounding communities to minimize impacts to traffic, businesses, residents, and other stakeholders.*" (Italics added.)

Mitigation measure CN-5 provides, in relevant part: "*Metro shall coordinate with local communities during preparation of the traffic management plans* to minimize potential construction impacts to community resources and special events." (Italics added.)

Mitigation measure DR-5 provides: Metro "shall not hinder access to" public parking lots during construction

On June 29, 2012, the FTA issued its record of decision for the Project under NEPA and found the EIR met the requirements of Federal Transit Law.

C.    *Tunnel Construction Methods*

Most of the Project's 1.9-mile tunnel is being built using an underground tunnel boring machine (TBM). If feasible, Metro

9

employs the TBM method because it is far less disruptive to surface traffic and adjacent land uses than the cut-and-cover method. However, the Project—as approved—will construct a portion of the tunnel on Flower Street (near and around the Bonaventure) by cut-and-cover construction rather than by TBM.

The two construction methods differ in many ways, including their impact on the areas above the excavation sites. Under cut-and-cover construction, four lanes of Flower Street would be decked so that traffic could pass overhead as the tunnel is constructed below ground. Cut-and-cover is a traditional and very common construction method for underground facilities and it entails excavating down from the ground surface. A temporary excavation support is provided to stabilize the ground and excavation is carried out inside the supported area. Temporary concrete decking can be placed over the cut immediately following the first lift of excavation (at about 12 to 15 feet below ground surface) to allow traffic to pass above. Once the deck is in place, excavation and internal bracing would continue to the required depth. Once the desired construction is complete inside the excavated area, the excavation is backfilled and the surface is restored permanently. Portions of Flower Street near the Bonaventure were to remain partially uncovered at times to allow for the foregoing construction until completion and restoration of the street surface.

TBMs are large-diameter horizontal drills that predominantly excavate circular tunnel sections. The excavated material is removed through the tunnel by hopper type rail cars or a conveyor system. As the machine advances, both the ground in front of the machine and the hole it creates are continually supported by the machine shield and pre-cast concrete tunnel

10

liners.  This method creates a tunnel with little or no disruption at the surface that is especially suitable for creating a circular opening at greater depths than would be practical for cut-and-cover construction.

Having conducted various studies[3] on tunnel design and construction on Flower Street, Metro concluded that part of the tunnel extending under Flower Street from 4th Street to the 7th/Flower Street Station would be built using cut-and-cover construction, rather than TBM, for multiple reasons: 1) unsuitable and unstable soil having high subsidence risk; 2) the shallowness of the tunnel at that point; and 3) the presence of hundreds of underground tiebacks[4] along the tunnel route. Metro considered cut-and-cover the only practicable method for this specific location, and use of the TBM was precluded because the tiebacks and other risks made it infeasible.  This information was already known to the public, as it was revealed in the draft EIR, the supplemental EIR, and the final EIR.

---

[3]     Two studies are dated February 4, 2011, and one study is dated April 20, 2012.

[4]     Tiebacks are steel bar or steel strand tension elements used to provide lateral support and temporary support of walls for foundation excavations.  Tieback rods were driven into the soils during construction about 40 years ago.  Metro estimated there are 403 tiebacks that would have to be removed if tunnel construction used TBM.  Each time a tieback is encountered, tunneling via TBM halts to allow removal of the tieback; this constraint rendered TBM construction not practicable in the Flower Street portion of the Project.

D.    *Prior Related Litigation*

On May 25, 2012, Today's IV filed a petition for writ of mandate and complaint for injunctive and declaratory relief under CEQA against Metro in Los Angeles Superior Court case No. BS137540 and sought to halt construction of the Project.[5] Today's IV challenged Metro's approval and certification of the final EIR for the Project, claiming Metro failed to comply with CEQA.  Today's IV also challenged the sufficiency of the EIR on the ground it fails to discuss the TBM method to construct the tunnel on Flower Street, the use of which would reduce the adverse environmental impacts of cut-and-cover construction.

The mandamus action was tried on May 14 and 15, 2014. On November 10, 2014, the trial court denied the petition for writ of mandate and entered judgment in Metro's favor.

Today's IV appealed and argued Metro's certification of the Project's EIR must be reversed.  It contended: the EIR's analysis of the impacts to Bonaventure's driveways, garage, and loading dock vehicular ingress and egress was insufficient; feasible alternative construction methods such as TBM, with far less severe environmental impacts than cut-and-cover construction, were not properly adopted in the EIR; and the scope and duration of noise and glare from nighttime construction was not fully and properly analyzed in the EIR.

---

[5]    On May 25, 2012, CNP's previous owner—515/555 Flower Associates LLC (FA)—also filed a petition for writ of mandate and complaint for injunctive and declaratory relief in Los Angeles Superior Court case No. BS137271.  Upon acquiring CNP from FA, FSP inherited the case against Metro.

12

On October 28, 2015, our colleagues in Division Five of the Court of Appeal, Second Appellate District, affirmed the trial court's denial of the petition for writ of mandate and affirmed the judgment upholding Metro's certification of the final EIR.  (See *Today's IV, Inc. v. Los Angeles County Metropolitan Transportation Authority* (Oct. 28, 2015, B260855) rehearing den. and modified opn. ordered nonpub. Nov. 19, 2015.)  The Court of Appeal found "substantial evidence the closed- and open-face tunneling boring machine [(TBM)] methods are not feasible alternatives to the cut and cover technique."  It also found recirculation of the EIR was unnecessary because Today's IV "failed to sustain its burden of proof concerning the economic feasibility of a deeper tunneling profile."  It disagreed with Today's IV that the EIR failed to analyze the full scope and duration of noise impacts from nighttime construction, citing various portions of the EIR discussing construction noise and mitigation measures.  The Court of Appeal held the EIR "describes in sufficient detail the best management practices and noise control devices to accomplish reduction in construction-related noise levels to below those specified by the [FTA]." It found the "specifics of how much noise impacts actually will be generated and the mitigation measures will be implemented during construction of the project are not ascertainable beforehand" and thus the EIR is "not deficient for failing to disclose such unknown matters."  Metro's "delaying identification and implementation of more specific mitigation measures until such impacts arise is proper."

In March 2016, Project construction began.

13

E.    *Operative Fourth Amended Complaint*

On March 17, 2016, Today's IV initiated the underlying action against respondents.

On October 31, 2018, Today's IV filed the operative fourth amended complaint (4AC) alleging the following causes of action: 1) declaratory relief against Metro and RCC for CEQA violations; 2) equal protection violations against Metro; 3) nuisance against Metro and RCC; 4) trespass against RCC; and 5) inverse condemnation against Metro.[6]  It also sought punitive damages against RCC.

The 4AC included the following factual allegations:

1.    CEQA Compliance

Before commencing construction on the Project, Metro determined the Project was not exempt from CEQA.  Thereafter, Metro's Board never voted to or declared itself exempt from CEQA.  Metro prepared a draft and final EIR complying with various CEQA provisions for nonexempt projects.  A notice of determination filed on April 27, 2012 by Metro with the Los Angeles County's Office of Planning and Research provides that an EIR was prepared for the Project "pursuant to the provisions of CEQA."  No part of Metro's administrative record discloses evidence of any exemption because Metro determined the Project

---

[6]    Today's IV later voluntarily dismissed with prejudice its cause of action for trespass against RCC and did not challenge on appeal the trial court's resolution of the cause of action for violation of equal protection against Metro and cause of action for declaratory relief against respondents.  We do not address these claims beyond this point except as they relate to the issues pending before us.

14

was not exempt. Per Today's IV, Metro should be estopped from now claiming an exemption that would allow Metro to avoid CEQA compliance.

2. Conspiracy and Resulting Settlement Agreement with FSP

Beginning January 2014, FSP and Metro "began communicating and negotiating, through their respective counsel . . . concerning a possible resolution of the litigation in return for [Metro's] agreement to certain terms and conditions concerning the scheduling, manner and location in which construction work for the Project would be conducted on Flower Street." The subject of these negotiations were matters "which would have, and should have, been the subject of a Traffic Management Plan and Worksite Traffic Management Plans . . . to be prepared, disclosed to the community and to impacted stakeholders, and to be the subject of community and stakeholder input." According to Today's IV, "[a]t all times, these negotiations were kept secret from Bonaventure."

As a result of these negotiations and discussions, on June 30, 2015, Metro "surreptitiously entered into an agreement with the Bonaventure's neighbor, the owner of CNP" (i.e., FSP) and "did so with the express intent of . . . isolating and punishing the Bonaventure for opposing the Project" and to "depriv[e] the Bonaventure of its rights under the [Mitigation MRP]." The settlement agreement provided that FSP shall work together with Metro to dismiss FSP's pending CEQA case against Metro. This settlement agreement was "kept secret" when respondents proposed construction schedules and traffic detours.

Because of the settlement agreement, Metro "agreed to actually perform more work at night and on the weekends than

15

was contemplated in" the EIR and Mitigation MRP. The increase in nighttime work caused "a disproportionate amount of damage" to the Bonaventure, which "functioned as a hotel with sleeping as its primary function," but did not disrupt CNP during its critical business hours, as CNP functioned as "an office building and garage" with its operations "almost entirely during normal weekday business hours." The settlement agreement "committed [Metro] to doing noisy work (*e.g.*, Main Relocation, Pile and Cap Beam Installation, Deck Installation, and [TBM] removal) at nights and on weekends when [Bonaventure] guests would be sleeping but when CNP's office would be empty." The nighttime construction "guaranteed that the Bonaventure's guests would have to bear the brunt of the unreasonable construction impacts by having their sleep—the principal reason for staying at a hotel—disturbed."

In addition to an increase in nighttime work, construction during the weekends caused blockages at the Flower and 4th Streets intersection and at the Flower and 5th Streets intersection. The settlement agreement allowed Metro "to close the entire block of Flower Street between 4th and 5th Streets for TBM Removal *during the Night Period or the Weekend Period*, which completely eliminated access to the Bonaventure parking garage, loading dock and main passenger pick-up and drop-off area"; this did not affect CNP "because its businesses were generally closed in the evenings." This damaged the Bonaventure because it regularly scheduled special events held during the weekends, and the street blockages "resulted in unreasonably complex and sometimes irrational detours which made it difficult for hotel guests and event invitees to reach the Bonaventure." CNP's tenants and guests would not be

16

inconvenienced by such weekend work, however, as it operated as weekday office space.

For instance, "to give preferential treatment to CNP, [Metro] applied for a Noise Ordinance Variance for the period October 8, 2016 through March 8, 2017—five months—for weekend night and Sunday work . . . which [Metro] knew would be noisy and particularly harmful for the Bonaventure's operation as a hotel." There were times the "noise level was so high, including from jackhammering, that the Bonaventure's own managers staying at the hotel could not sleep, numerous guests complained and demanded to be moved, and guests had to be compensated for their discomfort." Today's IV also lost a lucrative, long-term airline contract with the Bonaventure due to the construction because it "interrupted flight crew sleep."[7]

Because of its agreement with CNP, respondents were "contractually unable to consider or implement other reasonable scheduling or traffic options or explore the possibility of those options . . . which might minimize disruption to the Bonaventure or at a minimum, ensure that it was not solely impacted by the construction activities." Per Today's IV, Metro agreed—via paragraph 23 of the settlement agreement[8]—that "provision[s] in

---

[7]    We later learn it was a $3.3 million airline contract.

[8]    The record before us includes a copy of the settlement agreement between Metro and CNP. Paragraph 23 provides: "Metro acknowledges and agrees that mitigation measures were adopted by Metro in connection with the certification of the [EIR] and that certain mitigation measures are applicable to the construction of the [Project] in the Cut/Cover Area (the '[EIR] Mitigation Measures'). In addition, the Contract Documents contain standards and requirements for the Design-Build

17

the Settlement Agreement *would have priority over the provisions of the [EIR], including the [Mitigation MRP], should the two conflict*, which had the direct effect of . . . ensuring that any negative impacts of the Project were mitigated only as to CNP." The "secret agreement with, and preferential treatment of, CNP, violated . . . Metro's obligations under CEQA" as it pertains to mitigation measures DR-5, CN-3, CN-5, and TR-1.  For instance, while mitigation measure CN-3 provides that Metro develop traffic plans in coordination with the community to minimize disruption during special events, Today's IV was never provided that option and RCC "took the position that the Bonaventure was not entitled to see any [Traffic Management Plan] prepared."

It was unreasonable for respondents to: "enter into a Settlement Agreement which failed to give the Bonaventure equal treatment and which disabled [respondents] from employing the [mitigation measures]"; and "enter into a Settlement Agreement which severely obstructed vehicle and

---

Contractor to perform that are intended to reduce environmental impacts from the [Project] (the 'Contract Standards'). . . . *Metro agrees that it shall perform and comply with and cause the Design-Build Contractor to perform and comply with the [EIR] Mitigation Measures and Contract Standards, as applicable. The [EIR] Mitigation Measures and the Contract Standards are in addition to and do not limit, derogate from, replace or override any of the covenants of Metro set forth in this Agreement. The obligations of Metro in the [EIR] Mitigation Measures, the Contract Standards and this Agreement are cumulative.*  Metro agrees that all of its obligations in this Agreement shall be performed at its sole cost and expense and FSP shall have no obligation to reimburse Metro for any of such obligations." (Italics added.)

pedestrian access to the Bonaventure at nights and weekends because of the transfer of work to night and weekends beyond what was contemplated by the [EIR]."

### 3. "Unreasonable" Use of Cut-and-Cover in lieu of TBM

Respondents "knew" that by declining to use TBM and failing to implement the mitigation measures provided in the final EIR, significant negative impacts would "disproportionately impact" the Bonaventure given its limited access points and its use as a hotel. Respondents "knew" that using cut-and-cover construction "was slower and more expensive than tunneling, and would cause unnecessary and unreasonable adverse impacts that would have been substantially avoided by tunneling," including substantial interference with access to the Bonaventure's parking garage, loading dock, and guest pick-up/drop-off, and intolerable noise levels, particularly at night. TBM/tunneling "was both feasible and reasonable course of action"; it would have "save[d] [Metro] millions of dollars" and "would speed completion of the Project."

Numerous customers complained about the unpleasant impact of construction on their experience as guests. Per Today's IV, these "negative impacts occurred" because respondents "failed to construct the Project in a reasonable manner and as originally designed" and "failed and refused to use reasonable alternative methods of construction, including tunneling underneath Flower Street" by TBM. Although the EIR provided mitigation measures with "reasonable and feasible alternatives that would lessen impacts on local stakeholders, such as the Bonaventure," respondents were "unreasonable" by not pursuing these available mitigation measures.

19

It was unreasonable for respondents to "not employ cheaper, faster and less disruptive tunneling" and "not . . . implement [mitigation measures] which would have reduced serious negative environmental impacts."

4.    Traffic Management Plan

Respondents also "failed to produce a timely or proper Traffic Management Plan" (TMP)[9] for the businesses on or about Flower Street, although the Mitigation MRP required preparation of one.  Metro "purposefully disabled itself from preparing a timely and proper, community-based TMP by having secretly entered into" the settlement agreement with the owners of CNP, which favored one stakeholder's business operations over another—the Bonaventure.  "Had [Metro] and RCC consulted and worked with the Bonaventure, and not simply favored another stakeholder's interests, a meaningful TMP . . . could have been prepared."  Instead, respondents conspired to prepare "sham drafts of a TMP" and only did so after the time/deadline required by the Mitigation MRP—i.e., before commencement of construction work on Flower Street.  Reasonable alternatives to the traffic plans and schedules proposed by Metro were never considered or proposed "because they already had been precluded by the Settlement Agreement with CNP."  This went against the express terms of the Mitigation MRP, which "recognized that working in a cooperative manner with stakeholders was a reasonable and feasible alternative to lessen impacts of the Project."

_____

[9]    A TMP would have set forth reasonable and feasible methods and alternatives for construction and completing the Project while minimizing impacts on local stakeholders.

Construction work "consistently and unreasonably blocked or interfered with access to" Bonaventure's driveways, parking garages, and loading docks via Flower Street. Respondents "consistently and unreasonably rerouted traffic in the area" surrounding the Bonaventure and "made it much more difficult for guests to reach" the hotel when less onerous traffic methods were available. Numerous customers/guests complained about the lack of access to the Bonaventure.

5. Manipulation of Noise Level Limits

Today's IV alleged respondents "conspired to intentionally violate the noise standards" due to "their animus toward the Bonaventure" and desired "haste to complete the Project." Respondents "installed pre-construction ambient noise monitors" near a building exhaust portal, knowing it would "generate a false, excessively high ambient noise reading" which had "the effect of misleadingly raising the level of actual noise which would appear to be within applicable noise standards." In addition, respondents placed noise monitors near the Bonaventure "*behind* street level noise barriers, making the readings inapplicable to reflect noise levels above the barriers, where the Bonaventure's guest rooms are located." As a result of this "unreasonable and retaliatory pre-construction 'ambient' noise measurement on Flower Street near the Bonaventure," the standards set forth by respondents allowed for "much higher daytime and nighttime noise generation." In addition, "the physical structure of Flower Street in the area of the Bonaventure, would create *canyon-like noise impacts*, and would magnify noise upward." (Italics added.) Despite noise complaints by Today's IV, respondents failed to assure they are employing "the best available current technology for noise suppression."

21

This conduct "was unreasonable and disproportionately impacted the Bonaventure because of its use as a hotel."

Respondents knew that the Bonaventure constituted a "residential use" with a high density of sleepers/guests. "[B]ecause of its operation as a hotel, [the Bonaventure] would suffer unique and peculiar injury from having noisy nighttime work and impaired access for guests." According to Today's IV, "[o]ther stakeholders, including CNP, were not required to suffer such noisy work or to have their operations disrupted." It was unreasonable for respondents to: "not . . . employ adequate noise and dust protective measures to provide adequate protection . . . for the Bonaventure"; and "not . . . implement [mitigation measures] which would have reduced serious negative environmental impacts."

### 6. Causes of Action

Based on the foregoing, Today's IV brought these causes of action and requests for relief against Metro and/or RCC:

#### a. *Claim for Nuisance Against Metro and RCC*

Today's IV requested compensatory damages, punitive damages, attorney fees and costs as a result of Metro's and RCC's "unreasonable" conduct and manner of construction—including, but not limited to, Metro "employ[ing] the highly disruptive cut-and-cover construction technique when tunneling . . . was entirely feasible, less disruptive, less time-consuming, and less expensive"; Metro and RCC "perform[ing] work on nights and weekends which was both extraordinarily noisy and completely disruptive of traffic patterns and access" to the Bonaventure's loading dock, parking garage, and main passenger drop-off/pick-up driveway; Metro's and RCC's failure to timely draft a TMP

22

and coordinate traffic scheduling plans with the Bonaventure; unreasonable disruptive noise at all hours, "especially during night-time construction"; and Metro's failure to employ adequate noise protective measures for the Bonaventure and its guests/invitees.  Metro's and RCC's "intentional, reckless and negligent actions and failures to act . . . constitute a continuing nuisance by unlawfully interfering with, obstructing and preventing the full and free enjoyment and use of the Bonaventure."  Ordinary persons "would find the aforementioned conduct unreasonable, annoying and disturbing."  Metro's and RCC's actions were against "public policy . . . to reduce environmental impacts when feasible"; such feasible measures were "initially adopted and then unreasonably abandoned" and for this reason, the immunity provided by Civil Code section 3482[10] from nuisance claims did not apply.

> ### b. *Claim for Inverse Condemnation Against Metro Only*

The Project "adopted, and promised to comply with CEQA, and the [Mitigation MRP], which provided measures to lessen impacts of the Project."  "To spite the Bonaventure for its opposition to the Project, and to isolate the Bonaventure from other stakeholders, [Metro] abandoned the original plan to construct the Project in compliance with CEQA" and instead, committed itself to the terms of the settlement agreement with CNP, which caused "unnecessary and substantial damage to the Bonaventure."

---

[10]     Further undesignated statutory references are to the Civil Code.

The Mitigation MRP provided it was "desirable for [Metro] to coordinate access so as to minimize blockage of the Bonaventure's sole garage entrance and sole passenger pick up entrance." Changes following the settlement agreement with CNP "led to frequent partial and complete closures of Flower Street in front of the Bonaventure, making it impossible for many customers to access the property." Metro caused equipment and construction to block customer entry and pedestrian access. It was "unreasonable and unnecessary" for Metro to change its construction plans, forego preparation of TMP's in compliance with the Mitigation MRP, to route traffic in a way where the Bonaventure's guests were disproportionately impacted, to set up equipment that blocked access to the Bonaventure, and to pursue cut-and-cover construction when "tunneling was available" to Metro and was a "faster, cheaper and less damaging method for completing the Project" and it was "unreasonable" for Metro to pursue a method of construction that was "slower, more expensive, and more damaging to the environment."

Metro's conduct constituted an invasion of Bonaventure's valuable property right and caused "unnecessary and substantial damage" that "directly and specially affected" the Bonaventure. Sales at the Bonaventure's shops and restaurants have decreased and it has lost valuable contracts and sustained loss of business.

The damage proximately caused by Metro was "far disproportionate to and excessive when compared with the harm suffered by any other property in the [area]." Metro's conduct "constituted an unlawful taking of" the Bonaventure without due compensation or reimbursement.

### c. *Request for Punitive Damages Relief Against RCC Only*

And finally, Today's IV alleged RCC was "actively involved" in the nuisance and "knowingly aided and abetted [Metro's] violations of the law," including CEQA, by "conducting misleading and inaccurate noise measurements." RCC knew about the Mitigation MRP and yet "encouraged" Metro to disregard the mitigation measures and "to pursue unlawful and damaging construction methods." RCC's senior executives "at all times knew of the conduct alleged" and "either authorized or ratified the conduct . . . directly responsible for the . . . damages described." RCC's conduct was "undertaken with fraud, oppression and/or malice" sufficient to entitle the Bonaventure to an award of punitive damages.

### 7. Exhibits to the 4AC

Attached as exhibits to the 4AC were the following:

1) A copy of the claim Today's IV filed with Metro on April 13, 2017, claiming $27.3 million in damages for lost room revenues, lost food and beverage revenues, lost parking revenue, and other miscellaneous lost revenue as a result of Metro's "nuisance and interference with prospective economic advantage" due to "interference with access to the hotel through night and weekend street closures, blocking access driveways, noise and other characteristics of [the Project's] construction activity." (The claim was later denied.)

2) The June 30, 2015, settlement agreement between Metro and CNP.

3) A copy of the "Project Noise Control Plan" dated March 19, 2015, prepared for Metro by Kroner Environmental

25

Services, Inc., on behalf of RCC.  The report identified the "proposed noise limits" for cut-and-cover construction on Flower and 5th Streets at 85 dBA during daytime and 77 dBA at nighttime.  The "proposed noise limits" were based on "baseline noise levels" that were monitored at that site, reflecting a daytime Leq between 75 and 98 dBA and a nighttime Leq between 72 and 93 dBA.

F.    *Respondents' Motions Against Today's IV*

From December 2018 through September 2019, respondents filed a series of motions against Today's IV, the results of which form the basis of the appeal before us.[11]

On December 4, 2018, RCC filed a motion to strike portions of the 4AC, including the prayer for punitive damages.  The trial court granted the motion and struck the language related to Today's IV's request for punitive damages relief.

On December 11, 2018, Metro filed a demurrer to the 4AC and argued it failed to state facts sufficient to constitute a cause of action against Metro for inverse condemnation.  The trial court agreed and sustained the demurrer without leave to amend.

On February 4, 2019, RCC filed its answer to the 4AC's nuisance cause of action.  RCC "generally and specifically" denied each and every allegation in the 4AC and asserted 29 affirmative defenses, including: failure to state facts sufficient to constitute a cause of action; failure to exhaust all administrative remedies under the law before commencing suit; immunity from liability based on Section 3482; CEQA statutory exemption from liability for nuisance; and collateral estoppel on issues already litigated.

---

[11]    We recite only the information relevant to our review of the underlying orders from which Today's IV appeals.

26

On May 2, 2019, Metro filed its amended answer to the 4AC's cause of action for nuisance. Metro "denie[d], generally and specifically, each and every material allegation made" in the 4AC. Metro asserted 11 affirmative defenses, including: failure to state facts sufficient to state a cause of action; immunity from liability based on section 3482; CEQA statutory exemption from liability for nuisance; and collateral estoppel on the issue of whether TBM/tunneling is a feasible construction method on Flower Street.

Thereafter, on August 23, 2019, Metro filed a motion for judgment on the pleadings (MJOP), which RCC joined, as to the 4AC's nuisance cause of action. The trial court granted both respondents' MJOP without leave to amend.

And finally, on September 20, 2019, RCC filed a motion for summary adjudication as to the nuisance cause of action in the 4AC, which the trial court granted.

G.     *Entry of Judgments*

On May 15, 2020, the trial court entered two judgments.

It entered judgment in favor of RCC and against Today's IV reciting its order granting RCC's motion to strike portions of the 4AC and its orders granting RCC's motion for summary adjudication and MJOP without leave to amend.

It also entered judgment in favor of Metro and against Today's IV reciting its orders sustaining Metro's demurrer to the 4AC without leave to amend and granting Metro's MJOP without leave to amend.

On June 2, 2020, Today's IV appealed the judgment in favor of Metro.

On July 10, 2020, Today's IV appealed the judgment in favor of RCC.

H.   *Consolidation of the Two Appeals*

On January 20, 2021, this court ordered the two appeals consolidated for all purposes.

## DISCUSSION

A.   *Appeal from Order Sustaining Metro's Demurrer to the 4AC's Inverse Condemnation Cause of Action*

Today's IV (appellant) contends the trial court erroneously sustained Metro's demurrer to the inverse condemnation cause of action without leave to amend.  Appellant maintains it adequately pleaded a cause of action for inverse condemnation.

We conclude the 4AC did not and cannot allege a sufficient "taking or damaging" under the law of inverse condemnation.

### 1.   Underlying Motion and Ruling

On December 11, 2018, Metro filed a demurrer to the 4AC and argued it failed to state facts sufficient to constitute a cause of action against Metro for inverse condemnation.  Metro argued none of the allegations in 4AC regarding noise impacts and temporary interferences with access showed construction was conducted in an unreasonable or unnecessary manner or that impacts to the Bonaventure have been unique.  Metro also argued "Bonaventure's 'unique' status as a hotel on a street occupied mainly by offices cannot be the basis for an inverse condemnation claim."  The noise impacts alleged "are the types of impacts common to all major construction projects."

On January 18, 2019, the trial court sustained Metro's demurrer to the 4AC's inverse condemnation cause of action, without leave to amend.

## 2. Standard of Review

A demurrer tests the legal sufficiency of the challenged pleading. (*Milligan v. Golden Gate Bridge Highway & Transportation Dist.* (2004) 120 Cal.App.4th 1, 5.) When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action on any theory. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*); *Beason v. Griff* (1954) 127 Cal.App.2d 382, 386–387.) We review de novo a trial court's ruling on a demurrer. (*Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 163 (*Dudek*).)

We accept as true all material facts properly pleaded in the complaint, but do not assume the truth of contentions, deductions, or conclusions of fact and law. (*Dudek, supra,* 34 Cal.App.5th at p. 154; *Estate of Holdaway* (2019) 40 Cal.App.5th 1049, 1052.) The question of a plaintiff's ability to prove the allegations, or the possible difficulty in making such proof, does not concern the reviewing court and plaintiffs need only plead facts showing they may be entitled to some relief. (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496.)

In addition, " '[w]hen a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." ' " (*Dudek, supra,* 34 Cal.App.5th at p. 163.) The plaintiff (here appellant) shoulders the burden to show a reasonable possibility the operative complaint can be amended to state a cause of action. (*Id.* at pp. 163–164; *Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 902 (*Community Cause*).) Plaintiff can make

29

this showing in the first instance to the appellate court.  (*Roman v. County of Los Angeles* (2000) 85 Cal.App.4th 316, 322.)

### 3.    Applicable Law

An inverse condemnation cause of action derives from article I, section 19 of the California Constitution, which provides private property may not be "taken or damaged for a public use" without just compensation.  (Cal. Const., art. I, § 19, subd. (a).) " '[I]n an inverse condemnation action, the property owner must first clear the hurdle of establishing that the public entity has, in fact, taken [or damaged] his or her property before he or she can reach the issue of "just compensation." ' "  (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 939–940 (*SD G&E*).)

"Property is 'taken or damaged' within the meaning of article I, section 19 of the California Constitution, so as to give rise to a claim for inverse condemnation, when: (1) the property has been physically invaded in a tangible manner; (2) no physical *invasion* has occurred, but the property has been physically *damaged*; or (3) *an intangible intrusion onto the property has occurred which has caused no damage to the property but places a burden on the property that is direct, substantial, and peculiar to the property itself.*"  (*Oliver v. AT&T Wireless Services* (1999) 76 Cal.App.4th 521, 530, last italics added (*Oliver*).)  The property owner has the burden of establishing that the public entity has, in fact, taken or damaged his or her property.  (*SD G&E*, *supra*, 13 Cal.4th at p. 940.)

"When . . . the conduct of a public entity results in an intangible intrusion onto the plaintiff's property that does not physically damage the property, the question whether there has been a 'taking or damaging' of the property sufficient to support a

30

cause of action for inverse condemnation is more difficult.  In these circumstances the plaintiff must allege that the intrusion has resulted in a burden on the property that is direct, substantial, and peculiar to the property itself." (*SD G&E, supra,* 13 Cal.4th at p. 940.)  The California Supreme Court has stated that "a burden on neighboring property is sufficiently direct and substantial if the neighboring landowner can establish that the consequences of the intangible intrusion are 'not far removed' from a direct physical intrusion." (*Oliver, supra,* 76 Cal.App.4th at p. 531.)

Intangible intrusions have been recognized as sufficient to constitute a taking or damaging of property in limited circumstances, such as the intrusion into the plaintiffs' home of nauseous gases and/or strong, offensive odors emanating from an adjacent, upwind sewage treatment facility rendering the plaintiffs' home uninhabitable and causing the plaintiffs nausea and burning eyes.  (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 289, 294, 297–299 (*Varjabedian*).)  Noise, dust, and debris from a freeway expansion that included a 23-foot embankment directly in front of the plaintiff's home, causing physical damage and respiratory problems, was also considered a taking.  (*Harding v. State of California ex rel. Dept. of Transportation* (1984) 159 Cal.App.3d 359, 362, 365–367 (*Harding*).)  Noise from commercial jet aircraft landing and taking off that substantially interfered with the use and enjoyment of neighboring residential property may constitute a taking.  (*Aaron v. City of Los Angeles* (1974) 40 Cal.App.3d 471, 486, 493.)

To prevail on an inverse condemnation claim, "there must be an invasion or an appropriation of some valuable property

31

right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury." (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 119–120.) The landowner's property must be singled out for singular and unique treatment in contrast to other landowners who could be affected by the proposed public work. (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1548–1549 (*Border Park*).)

4. <u>Analysis</u>

The first two circumstances that justify an inverse condemnation claim are not applicable here, as appellant does not contend that its property has been physically invaded or physically damaged. Thus, appellant necessarily relies upon the intangible intrusion theory. To recover under this theory, appellant must be able to establish its property suffered from an intangible intrusion burdening the property in a way that is direct, substantial, and peculiar to the property itself. (*Oliver*, *supra*, 76 Cal.App.4th at pp. 530–531.)

Appellant argues the gravamen of the 4AC's cause of action for inverse condemnation consists of a taking or damaging of property via two alleged types of intrusions: 1) impairment of access; and 2) excessive noise and dust. We address each in turn.

a. ***Impairment of Right of Access***

An action for inverse condemnation can be based on substantial impairment of the right of ingress and egress, also known as the easement of access. (*Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659, 663 (*Breidert*).) Courts have "long recognized that the urban landowner enjoys property rights, additional to those which he exercises as a member of the public, in the street upon which his land abuts. Chief among these is an

32

easement of access in such street." (*Ibid*.) This consists of "the right to get into the street upon which the landowner's property abuts and from there, in a reasonable manner, to the general system of public streets." (*Ibid*.)

"Not every interference with the property owner's access to the street upon which his property abuts and not every impairment of access, as such, to the general system of public streets constitutes a taking which entitles him to compensation." (*Breidert*, *supra*, 61 Cal.2d at pp. 663–664.) But an "unnecessary and substantial temporary interference with such property rights or an actual though temporary invasion of the right of possession of private property during construction" is actionable. (*Heimann v. City of Los Angeles* (1947) 30 Cal.2d 746, 755 (*Heimann*), disapproved on other grounds in *County of Los Angeles v. Faus* (1957) 48 Cal.2d 672, 679.) The property owner must show "substantial impairment of his right of access to the general system of public streets." (*Breidert*, at p. 664.)

First, appellant argues the 4AC adequately pleads Metro caused street blockages during the night or weekend period in order to pursue cut-and-cover construction when TBM was available, less costly, and less disruptive. Thus, the use of cut-and-cover was "unreasonable and unnecessary." The 4AC also provides "the changed construction method"—i.e., from TBM to cut-and-cover—"led to frequent partial and complete closures of Flower Street in front of the Bonaventure, making it impossible for many customers to access the property."

As early as 2010, Metro provided the public and the Flower Street Business District stakeholders (including appellant, as owner of the Bonaventure) the draft EIR, which included studies' findings on tunnel design and construction on Flower Street and

33

concluded that a portion of the Project would be built using cut-and-cover construction, rather than TBM, due to: 1) unsuitable and unstable soil having high subsidence risk; 2) the shallowness of the tunnel at that point; and 3) the presence of hundreds of underground tiebacks along the tunnel route.

This is an issue which has been raised, litigated, and decided on the merits in other actions. Previously, appellant litigated the issue of whether TBM/tunneling is a feasible alternative to the use of cut-and-cover construction near the Bonaventure in Los Angeles Superior Court case No. BS137271. Our colleagues in Division Five found there was substantial evidence the closed- and open-face TBM methods are not feasible alternatives to the cut and cover technique in that area of the Project. (See *Today's IV, Inc. v. Los Angeles County Metropolitan Transportation Authority*, *supra*, B260855.) Appellant is thus barred from relitigating this issue. (See *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 (*Lucido*) ["Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings"].)

At oral argument, appellant clarified to this court that it was not alleging or arguing that Metro's use of cut-and-cover construction was the problem. Rather it was the techniques used or cut-and-cover construction methods implemented is the conduct complained of. Appellant argued this distinction does not fall under the issue(s) decided in the prior appeal. While we appreciate appellant's position on appeal, it does not change the fact that a demurrer tests the sufficiency of the pleading, here the 4AC. The 4AC contains multiple allegations that specifically complain about the use of cut-and-cover in lieu of TBM/tunneling. For instance, the 4AC alleges: Respondents "knew *that using cut-and-cover construction methodology on Flower Street was slower*

34

*and more expensive than tunneling*, and would cause unnecessary and unreasonable adverse *impacts that would have been substantially avoided by tunneling*, including substantial *interference with access to Bonaventure . . . .*" (Italics added.) There are multiple similar allegations in the 4AC to that effect.

Second, the 4AC allegation that Metro's construction caused access restriction that was "unreasonable and unnecessary" is not a material fact properly pled. It is a conclusion of law to be disregarded when ruling on the sufficiency of a pleading. (See *Blank*, *supra*, 39 Cal.3d at p. 318.)

Third, appellant argues the 4AC adequately alleged that traffic detours set up by Metro amounted to impairment of access to the Bonaventure. The 4AC alleges Metro "consistently and unreasonably rerouted traffic in the area surrounding the Bonaventure and . . . made it much more difficult for guests to reach the Bonaventure. . . ." These "unreasonably complex and sometimes irrational detours . . . made it difficult for hotel guests and event invitees to reach the Bonaventure."

We are not persuaded. "Appellants are not entitled to compensation for temporary interference with their right of access, provided such interference is not unreasonable, that is, occasioned by actual construction work. It is often necessary to break up pavement, narrow streets and provide inconvenient modes of ingress and egress to abutting property during the time streets are being repaired or improved. Such reasonable and temporary interference with the property owner's right of access is noncompensable." (*People ex rel. Dept. of Public Works v. Ayon* (1960) 54 Cal.2d 217, 228 (*Ayon*).) The 4AC's allegations describe exactly the type of temporary interference that the *Ayon* court deemed "not unreasonable." Metro's construction on Flower

35

Street necessitated traffic detours which caused inconvenient modes of ingress and egress to the Bonaventure, as its main accessway was via Flower Street. In addition, the allegation of "difficult[y] for hotel guests and event invitees to reach the Bonaventure" is not enough. "Personal inconvenience, annoyance or discomfort in the use of property are not actionable types of injuries." (*Id.* at p. 228.)

The right of ingress and egress is not absolute. (*Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 167 (*Friends of H Street*).) A property owner "cannot demand that the adjacent street be left in its original condition for all time to insure his ability to continue to enter and leave his property in the same manner as that to which he has become accustomed. Modern transportation requirements necessitate continual improvements of streets and relocation of traffic. The property owner has no constitutional right to compensation simply because the streets upon which his property abuts are improved so as to affect the traffic flow on such streets. If loss of business or of value of the property results, that is noncompensable. It is simply a risk the property owner assumes when he lives in modern society under modern traffic conditions." (*Ayon, supra,* 54 Cal.2d at pp. 223–224.)

Metro correctly points out that "street alterations which cause significantly increased traffic or which reduce but do not eliminate access to a property do not give rise to a compensable taking." (*Border Park, supra,* 142 Cal.App.4th at p. 1554; see *Ayon, supra,* 54 Cal.2d at pp. 223–224; see also *Friends of H Street, supra,* 20 Cal.App.4th at p. 167.)

Appellant, however, argues the fact that "there may have still been limited access to the hotel during construction is not

dispositive," and cites *Liontos v. County Sanitation Districts* (1998) 61 Cal.App.4th 726 (*Liontos*) as support.  In *Liontos*, a fast-food restaurant owner brought a claim against a sanitation district and a contractor to recover damages for lost revenues allegedly caused by a construction project near the restaurant. (*Id*. at p. 728.)  After two months of construction, the job stopped for seven to nine months, after which construction resumed and the project was completed.  (*Ibid*.)  Traffic on the street was reduced to one lane north and one lane south, the intersection was blocked, heavy equipment was maintained along the perimeters of the traffic lanes, barricades were placed down the middle of the street for several hundred yards preventing left turns.  (*Id*. at p. 731.)  The fast-food business almost went out of business.  (*Ibid*.)  The trial court found the interference with traffic was reasonable.  (*Id*. at p. 732.)  The Court of Appeal reversed, and found the denial of access unreasonable. The court's holding was based on the fact that during the seven-to-nine-month delay of the project while defective pipe was being tested off-site, the obstructions remained in place yet no work was being done.  (*Id*. at pp. 732–733.)

Appellant's reliance on *Liontos* is misplaced.  First, the reviewing court in *Liontos* specifically held that the fast-food owner "cannot recover simply because access to [its] restaurant was temporarily impeded by reason of the presence of construction barriers and heavy equipment, provided that this interference was occasioned by actual construction work." (*Liontos*, *supra*, 61 Cal.App.4th at p. 729.)  Unlike in *Liontos* where there was a seven-to-nine-month delay when construction work ceased and yet the street barriers and heavy equipment (i.e., the interference/intrusion) remained, here the 4AC fails to

37

allege Metro's interference was *not* accompanied by actual construction work. In fact, the 4AC pled material facts to the opposite effect—that the actual construction itself caused the need for traffic detours to be implemented and, thus, necessarily accompanied the interference.

In addition, the delays alleged in the 4AC as a result of rerouted traffic were too ambiguously worded to qualify as properly pled facts. Unlike the seven-to-nine months' delay alleged in *Liontos*, the 4AC states "unreasonably complex and sometimes irrational detours . . . made it difficult for hotel guests and event invitees to reach the Bonaventure." This is not enough. How difficult? What was the length of time by which a delay was caused? When did the detours or delays happen? How often?

Furthermore, the 4AC does not satisfy the requirement set forth in *Oliver, supra*, 76 Cal.App.4th at page 530, that intrusion upon the right of access must result in a burden on the property that is *direct, substantial, and peculiar* to the property itself. The burden on a neighboring property is sufficiently direct and substantial if the neighboring landowner can establish that the consequences of the intangible intrusion are "not far removed" from a direct physical intrusion. (*Id*. at p. 531.) The *Oliver* court held plaintiffs' allegation that a newly constructed tower's height, maintenance, and operation caused a diminution in their property's value did not give rise to a claim for inverse condemnation. (*Id*. at pp. 531–532.) In so determining, the court referred to the burdens experienced by the plaintiffs in *Varjabedian* and in *Harding* as examples. (*Oliver*, at pp. 529, 531–532.)

The court in *Varjabedian* found noxious gases emanating from a sewage plant/facility whose odors rendered plaintiffs' adjacent property "untenantable for residential purposes" and caused plaintiffs to have physical symptoms such as burning eyes and nausea *could* give rise to an inverse condemnation claim. (*Varjabedian, supra,* 20 Cal.3d at pp. 293, 297, 299.)  Thus, the *Varjabedian* court held that plaintiffs should have been given an opportunity, via amendment of their pleadings if necessary, to demonstrate that their property suffered a direct, peculiar, and substantial burden as a result.  (*Id.* at p. 299.)  Similarly, in *Harding*, plaintiffs' complaint alleged the construction of a nearby freeway and 23-foot embankment resulted in a loss of air, causing temperatures in plaintiffs' home to increase, "making it untenable as a residential property."  (*Harding, supra,* 159 Cal.App.3d at p. 362.)  The complaint also alleged loss of light resulting in a loss of plaintiff's vegetable garden and alleged damage due to dust, dirt, and debris, which caused respiratory problems for plaintiffs.  (*Ibid.*)  The court found plaintiffs alleged unique damage to their property from dust, debris, and highway noise—sufficiently analogous to a direct physical intrusion to maintain an inverse condemnation claim.  (*Id.* at pp. 365–367; see *Oliver, supra,* 76 Cal.App.4th at p. 531.)

Here, appellant's allegations about respondents' construction impairing access to the Bonaventure do not rise to the *overpowering* level of the burdens imposed upon, and alleged by, the plaintiffs in *Varjabedian* and *Harding.*  Traffic detours, delays, and the difficulty experienced by guests traveling to the Bonaventure are burdens, to be sure; we do not discount that appellant's experience during years of construction caused great discomfort and loss of revenue to its hotel.  However, we cannot

find that traffic detours and delays resemble the types of burdens felt by the plaintiffs in *Varjabedian* (i.e., breathing noxious sewage fumes that rendered the property less habitable) and *Harding* (i.e., causing plaintiffs respiratory problems and loss of their vegetable garden). Traffic detours and delays cannot be characterized as burdens that are direct and substantial such that it is not far removed from a direct physical intrusion. (See *Oliver*, *supra*, 76 Cal.App.4th at p. 531.)

Fourth and finally, appellant argues it adequately explained that Metro's equipment "block[ed] customer entry and pedestrian access." Again, this is a conclusion of fact and does not include enough specificity to meet the requirements of a claim for inverse condemnation. For instance, for how long did the equipment block access to the Bonaventure? Was the placement of equipment there by respondents necessary? Was this interference accompanied by actual construction work? (See *Liontos*, *supra*, 61 Cal.App.4th at p. 729.) The answers to these questions are not included as part of the 4AC. " 'It would unduly hinder and delay or even prevent the construction of public improvements to hold compensable every item of inconvenience or interference attendant upon the ownership of private real property because of the presence of machinery, materials, and supplies necessary for the public work which have been placed on streets adjacent to the improvement.' " (*Ayon*, *supra*, 54 Cal.2d at p. 228.)

### b. *Excessive Noise and Dust*

Appellant next argues the 4AC sufficiently pled a cause of action for inverse condemnation as a result of "the timing and extent of noise and dust intrusion [which] uniquely interfered with . . . operation of its hotel." Appellant argues it "alleged in

40

detail why the construction noise and dust affected it in a way that was peculiar to the operation of a hotel in general and to the operation of this hotel in particular, not shared by the other primary stakeholder, CNP."

We find the 4AC does not sufficiently plead the intrusion suffered by the Bonaventure was "unique, special or peculiar" in comparison with other stakeholders in the area. In fact, paragraph 67 of the 4AC—which was "reallege[d] and incorporate[d]" into the inverse condemnation cause of action— actually pleads the opposite: "the excessive noise, dirt, dust, fumes, exhaust, vibration *which have characterized the Project's construction activity between Fourth and Fifth Streets on Flower.*" (Italics added.) Thus, as pled in paragraph 67, all stakeholders on Flower Street between 4th and 5th Streets experienced the same noise, dirt, dust, etc. The alleged noise and dust suffered by the Bonaventure was not unique, special, or peculiar to the hotel alone. CNP, also located on Flower Street where the Project construction took place, necessarily suffered the same noise and dust as a result of construction of the light rail in that area. (See *Border Park*, *supra*, 142 Cal.App.4th at pp. 1548–1549 [the landowner's property must be singled out for singular and unique treatment in contrast to other landowners who could be affected by the proposed public work].)

Appellant contends the 4AC alleged the same "noise and dirt" intrusion that the court in *Orpheum Bldg. Co. v. San Francisco Bay Area Rapid* (1978) 80 Cal.App.3d 863 (*Orpheum*) (abrogated on other grounds by *Los Angeles Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694) held "can be sufficient to support a claim." However, *Orpheum* held noise and dirt can support an inverse

41

condemnation claim so long as it was "unreasonable or unusual, given the size and scope of the . . . construction project." (*Orpheum*, at p. 869.) Here, the 4AC has not alleged the levels of noise and dirt were unreasonable given the "size and scope" of the Project. Noise and dust are expected byproducts of a massive public transit project that involves construction and tunneling. "[S]uch loss of peace and quiet is a fact of urban life which must be endured by all who live in the vicinity of freeways, highways, and city streets." (*Friends of H Street*, *supra*, 20 Cal.App.4th at p. 163.)

While the 4AC includes an allegation that "the physical structure of Flower Street in the area of the Bonaventure, would create *canyon-like noise impacts*, and would magnify noise upward, unlike other 'cut and cover' sites of the Project," this, too, is not enough. (Italics added.) The 4AC does not plead that the canyon-like noise effect was "unique, special or peculiar" to the Bonaventure in comparison with other stakeholders in the area. Again, CNP was located across the Bonaventure, and while the 4AC pleads the canyon-like noise impact was "unlike other 'cut and cover' sites," that does not negate the fact that CNP is a business/stakeholder located in the same area as the Bonaventure and may have experienced the same impact. Neither does the 4AC plead facts to show this canyon-like noise impact is unnecessary and substantial. Thus, the alleged intangible intrusion does not meet the requirement that it be unique, peculiar, or special to the Bonaventure alone. (See *Harding*, *supra*, 159 Cal.App.3d at p. 366 [plaintiff must allege they suffered unique, special, or peculiar damages, i.e., "not such as is common to all property in the neighborhood"].)

42

Finally, appellant argues the 4AC adequately pleads it suffered "significant negative impacts [that] disproportionately impact[ed]" the Bonaventure because of its land use for residential purposes due to its "high density of sleepers." Appellant contends this qualifies the intrusion suffered by the Bonaventure as unique and peculiar to the property itself. We disagree. Our State Supreme Court instructed in *Heimann*: " 'The damage for which compensation is to be made is a damage to the property itself, and does not include a mere *infringement of the owner's personal pleasure or enjoyment*. Merely rendering private property *less desirable for certain purposes*, or even causing personal annoyance or discomfort in its use, will not constitute the damage contemplated by the constitution.' " (*Heimann*, *supra*, 30 Cal.2d at p. 756 [inverse condemnation action where plaintiffs alleged loss of use of property during the city's construction of a viaduct, resulting from: contractor's piling of earth, rock, and other material in the streets and the erection of sawmills, sheds, and other structures on plaintiffs' uncondemned property; the accumulation of waste materials on and near the plaintiffs' premises; and the partial obstruction and closing of streets].)

We affirm the order sustaining the demurrer.

Now, as to whether the trial court abused its discretion in sustaining the order without leave to amend, appellant has not sufficiently argued on appeal that the trial court abused its discretion by denying leave to amend. Appellant has not suggested any possible curative amendment(s). Appellant provides one sentence on the topic citing *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967: " '[I]t is an abuse of discretion to sustain a demurrer without leave to amend if . . .

43

there is a reasonable possibility' that an amendment will cure the defect." Simply referencing the applicable standard of review is not enough. The burden is on the plaintiff (here, appellant) to demonstrate how it can amend the complaint and how the proposed amendment will change the legal effect of the pleading. (*Community Cause*, *supra*, 124 Cal.App.3d at p. 902.) Because appellant did not contend otherwise in its briefing, it does not appear the 4AC can be amended to allege any additional or new facts sufficient to state a cause of action for inverse condemnation.

B.    *Appeal from Orders Granting Judgment on the Pleadings in Favor of Metro and RCC*

Appellant argues the trial court erroneously granted judgment on the pleadings on the nuisance cause of action as to both Metro and RCC.

We disagree and find no error.

1.    Underlying Motion and Ruling

On August 23, 2019, Metro filed a MJOP and argued the "allegations on the face of the [4AC] fall short of stating a prima facie case of nuisance" because Today's IV failed to plead an essential element for nuisance—"that the seriousness of the harm to [Today's IV] outweighs the social utility of Metro's conduct." Metro also argued the 4AC "discloses a complete defense to a prima facie nuisance claim"—that Metro is immune from liability for nuisance by reason of section 3482. On September 23, 2019, RCC filed a MJOP and joined in Metro's MJOP as to the 4AC's nuisance cause of action.

On January 24 and 30, 2020, the trial court granted RCC's MJOP and Metro's MJOP, respectively. It found section 3482

conferred immunity on respondents for their construction of the Project; it also found appellant's argument is contrary to the purpose of section 3482 "especially because the injuries complained of were the normal consequences of a public construction in a metropolitan area and were temporary." On February 7, 2020, the court clarified that its orders granting judgment on the pleadings were *with prejudice*.

### 2. Standard of Review

A motion for judgment on the pleadings may be made on the ground that the complaint fails to state facts sufficient to constitute a legally cognizable claim. (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii); *Sofias v. Bank of America* (1985) 172 Cal.App.3d 583, 586.)

We review de novo whether a cause of action has been stated as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) When conducting this independent review of the grant of such a motion, an appellate court applies the same rules that govern review of the sustaining of a general demurrer. (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 146.) Appellate courts treat the pleadings as admitting all of the material facts properly pleaded, but do not assume the truth of contentions, deductions, or conclusions of law. (*Monsanto Co. v. Office of Environmental Health Hazard Assessment* (2018) 22 Cal.App.5th 534, 544–545; *Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1298.) We will not, however, credit the allegations in the complaint where they are contradicted by facts that either are subject to judicial notice or are evident from exhibits attached to the pleading. (*Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1300.)

The trial court may grant a motion for judgment on the pleadings with or without leave to amend. (Code Civ. Proc., § 438, subd. (h)(1).) Whether a motion for judgment on the pleadings should be granted with or without leave to amend depends on "whether there is a reasonable possibility that the defect can be cured by amendment." (*Blank, supra*, 39 Cal.3d at p. 318 [stating rule applied to a general demurrer].) "[I]t is an abuse of discretion to grant a motion for judgment on the pleadings without leave to amend ' "if there is any reasonable possibility that the plaintiff can state a good cause of action." ' " (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 260.) The appellant bears the burden of showing abuse of discretion and carries that burden by showing how the complaint can be amended. (*Ibid.*)

### 3. Applicable Law

The 4AC attempts to state a cause of action for private nuisance, i.e., a nontrespassory interference with the private use and enjoyment of land. (See Civ. Code, §§ 3479–3481.)

In *SD G&E, supra*, 13 Cal.4th at page 938, our Supreme Court set out the elements of an action for private nuisance. First, the plaintiff must prove an interference with his use and enjoyment of its property. Second, the invasion of the plaintiff's interest in the use and enjoyment of the land must be *substantial*, i.e., it caused the plaintiff to suffer substantial actual damage. Third, the interference with the protected interest must not only be substantial, it must also be *unreasonable*, i.e., it must be of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land

Substantial damage and unreasonableness are to be judged by an objective standard. (*Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 264.)

With respect to the substantial damage element, the degree of harm is to be measured by the effect the invasion would have on persons of normal health and sensibilities living in the same community. (*SD G&E*, *supra*, 13 Cal.4th at p. 938.) " 'If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one, even though the [idiosyncrasies] of the particular plaintiff may make it unendurable to him.' " (*Ibid*.)

With respect to the unreasonableness element, the primary test for determining whether the invasion is unreasonable is whether the gravity of the harm outweighs the social utility of the defendant's conduct, taking a number of factors into account. (*SD G&E*, *supra*, 13 Cal.4th at pp. 938–939.) "Again the standard is objective: the question is not whether the particular plaintiff found the invasion unreasonable, but 'whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable.' " (*Ibid*.)

The California Supreme Court has noted that the requirements of substantial damage and unreasonableness stem from the law's recognition that: " 'Life in organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms. It is an obvious truth that each individual in a community must put up with a

certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together. The very existence of organized society depends upon the principle of "give and take, live and let live," and therefore the law of torts does not attempt to impose liability or shift the loss in every case in which one person's conduct has some detrimental effect on another. Liability . . . is imposed in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation.' " (*SD G&E*, *supra*, 13 Cal.4th at pp. 937–938.)

However, section 3482 bars an action for nuisance against a public entity where the alleged wrongful acts are expressly authorized by statute. The Supreme Court has "consistently applied a narrow construction to section 3482 and to the principle therein embodied." (*Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 100 (*Greater Westchester*).)

A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the Legislature contemplated the doing of the very act which occasions the injury. (*Hassell v. San Francisco* (1938) 11 Cal.2d 168, 171 (*Hassell*).) A requirement of express authorization embodied in the statute itself ensures that an unequivocal legislative intent to sanction a nuisance will be effectuated, while avoiding the uncertainty that would result were every generally worded statute a source of undetermined immunity from

48

nuisance liability. (*Friends of H Street, supra,* 20 Cal.App.4th at p. 160; *Varjabedian, supra,* 20 Cal.3d at p. 291.) The *Hassell* test of statutory authorization requires a particularized assessment of each authorizing statute in relation to the act which constitutes the nuisance. (*Friends of H Street,* at pp. 160–161; *Varjabedian,* at p. 291, fn. 6.)

Although acts authorized by statute under section 3482 cannot give rise to nuisance liability, the manner in which those acts are performed may constitute a nuisance. (*Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 129 (*Venuto*); *Friends of H Street, supra,* 20 Cal.App.4th at p. 160.)

4.    Analysis

Appellant asserts the 4AC adequately states facts sufficient to constitute a claim for nuisance. We conduct independent review.

As a preliminary matter, we note the 4AC is peppered with statements that Metro's/RCC's conduct and/or construction was "unreasonable." We treat these statements as legal conclusions which the court may disregard when evaluating the legal sufficiency of the pleading. (See *Blank, supra,* 39 Cal.3d at p. 318.)

We first address whether the 4AC adequately pleads the invasion of the appellant's interest in the use and enjoyment of the hotel was substantial. The invasion is deemed substantial if it caused the plaintiff to suffer substantial actual damage. (*SD G&E, supra,* 13 Cal.4th at p. 938.)

We find the 4AC adequately pleads the substantial damage/interference element as it relates to a private nuisance cause of action. In addition to various allegations about impairments to the Bonaventure's right of access and excessive

49

noise/dust levels, the claim form submitted to Metro by appellant, dated April 13, 2017, states appellant suffered $27.3 million in damages for lost room revenues, lost food and beverage revenues, lost parking revenues, and lost miscellaneous revenues as a result of respondents' construction work. The 4AC alleges appellant lost a lucrative, long-term airline contract with the Bonaventure due to the construction because it "interrupted flight crew sleep." All of the foregoing constitutes significant harm.

We next address whether the 4AC adequately alleges facts to support the notion that respondents' interference was unreasonable. The primary test is whether the interference is of such a nature, duration, or amount that the gravity of the harm outweighs the social utility of the defendant's conduct. (*SD G&E*, *supra*, 13 Cal.4th at pp. 938–939.)

Respondents argue the 4AC fails to plead one of the essential elements for nuisance—the balancing of the harm suffered by appellant against the social utility of respondents' conduct. Respondents contend appellant cannot make that showing, for the social utility of respondents' conduct is highly valued as a matter of public policy.

"The factors to be considered in determining the social utility of conduct that causes an intentional invasion of another's interest in the use and enjoyment of property are found in section 828 of the Restatement Second of Torts: '(a) the social value that the law attaches to the primary purpose of the conduct; [¶] (b) the suitability of the conduct to the character of the locality; and [¶] (c) the impracticability of preventing or avoiding the invasion.' " (*Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123, 162.) The information presented in chapter 1 of the final

50

EIR discusses the purpose (and social utility) of the Project, including: that the Project will "improve the region's public transit service and mobility" and will allow for "greater accessibility while serving population and employment growth in downtown Los Angeles." The Project was "planned with the goal of improving travel times, reducing transfers, reducing traffic congestion, improving air quality, and creating a sustainable light rail transit system that serves people throughout the region as well as in downtown Los Angeles."

During oral argument, appellant represented it was not claiming the burden of pleading *unreasonableness* disappears where the nuisance complained of is the manner of construction, rather than the construction itself. We remind appellant of the following from his reply brief, where it contended the opposite: "Since [appellant] alleges that it was the manner in which the rail connector was constructed that constituted a nuisance (rather than the existence of that rail connector upon completion), [appellant] needed only to allege (as it did) that the Project could have been reasonably completed using less disruptive construction methods within the context of cut-and-cover construction. [Appellant] *did not have to also allege that the harm it suffered outweighed the social utility of the completed rail project.*" (Italics added.)

It is true that although acts authorized by statute cannot give rise to nuisance liability, the *manner* in which those acts are performed may constitute a nuisance. (See *Friends of H Street, supra*, 20 Cal.App.4th at p. 160; *Venuto, supra*, 22 Cal.App.3d at p. 129.) However, that does not negate the requirement that one adequately plead the "unreasonableness" element in the context of a private nuisance claim. The primary test for determining

51

whether the invasion is unreasonable is if the gravity of the harm outweighs the social utility of the defendant's conduct. (*SD G&E*, *supra*, 13 Cal.4th at pp. 938–939.) Appellant's argument directly contradicts case authority. Appellant provided no case law to support its interpretation of the "unreasonableness" element for nuisance, that is, one did not need to address the social utility of the completed Project itself because it alleges the *manner* of construction was the nuisance, rather than the Project construction itself.

Even if the manner of construction was the challenged interference, appellant was still required to plead in the 4AC that the seriousness of the harm it suffered outweighed the social utility of the Project. The 4AC contains no such allegation. It is not as simple as what appellant made it out to be during oral argument; it is not a mere issue of the magic words "social utility" not being used in the 4AC. Nowhere in the 4AC does it allege that the loss of business to the Bonaventure and loss of a lucrative airline contract is a harm suffered by appellant *that outweighed* the social utility of the Project constructing light rail lines. Nothing was provided as to whether the seriousness of the purported harm outweighs the social utility of the construction method utilized in building a major public transit project. The pleading is devoid of any allegation that compares or weighs the harm suffered versus social utility. As a result, appellant's nuisance claim as pleaded in the 4AC fails to state a prima facie case of private nuisance.

We next address whether the 4AC discloses on its face a complete defense based on the immunity from liability granted by section 3482.

Section 3482 provides: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."

Respondents argue their protection under section 3482 derives from express authority conferred by Public Utilities Code section 30631, which they contend the 4AC discloses on its face.

Public Utilities Code section 30631 provides, in relevant part: "The district may . . . *construct*, develop, . . . operate, maintain, control, use . . . *rights-of-way, rail lines, . . . stations*, platforms, . . . *and any and all other facilities for, incidental to, necessary for, or convenient for rapid transit service*, including, but not limited to, facilities and structures physically or functionally related to rapid transit service . . . *underground, upon, or above the ground and under, upon, or over public street[s]*."  (Pub. Util. Code, § 30631, subd. (a), italics added.)

Thus, we review whether the 4AC states adequate facts such that respondents' construction of the Project is expressly authorized, and thus immunized, by statute, i.e., by section 3482 via application of Public Utilities Code section 30631.

We find the 4AC pleads facts sufficient to invoke the protection of section 3482 via Public Utilities Code section 30631. We recite the allegations contained in the 4AC which cumulatively achieve this: The Project is a "1.9-mile subway line with three new stations in downtown Los Angeles linking" several Metro Lines and stations and constructing "a new underground station"; the Project "at all times was intended to increase access to the heart of the Los Angeles downtown and civic districts."  The Project "is being built for multiple purposes, including both to facilitate the transfer of passengers between other [Metro] rail lines, and to provide new and direct access to

Los Angeles' financial and business districts, thereby supporting population and employment growth." The Project fits the description of activity covered by Public Utilities Code section 30631, subdivision (a).

Appellant argues section 3482 does not bar its nuisance claim because the statute authorizing respondents to construct the Project does not *expressly* authorize respondents to employ the construction means and methods of which appellant complains. Appellant contends the statute on which respondents rely "simply gave . . . general authority to construct rail projects and to enter into contracts with private entities for purposes of doing so."

The "*Hassell* test of legislative authorization required a 'particularized' inquiry into [the] statute to ascertain whether there existed a legislative intent to sanction a nuisance." (*Greater Westchester*, *supra*, 26 Cal.3d at pp. 101–102.) To ascertain whether a legislative intent exists to sanction a nuisance, we must scrutinize the statute in question—here, Public Utilities Code section 30631. (See *Greater Westchester*, at pp. 101–102)

The statute authorizes the "district" to construct rail lines, both on and under public streets, for rapid transit service.[12]

---

[12]    The "district" denotes the Southern California Rapid Transit District (RTD). (Pub. Util. Code, § 30004.) In 1992, however, the Legislature merged the RTD with the Los Angeles County Transportation Commission to form Metro, which succeeded to all of the powers, duties, rights, and obligations of the RTD. (Pub. Util. Code, §§ 130050.2, 130051.13; *Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 342.)

54

It authorizes Metro to use and control public rights-of-way to construct and maintain a light rail transit line. The statute does not limit the construction activities of rail projects such that only specific methods of construction allow the rail project to rise to the level required to fall under the purview of Public Utilities Code section 30631. For instance, the statute does not limit the method or manner of construction allowed for building rail lines to only TBM and not cut-and-cover. The absence of any limitation on the method of construction of rail projects supports the inference that the Legislature did not intend to curtail protection of the construction of public rail projects against potential claims for nuisance based on specific manner or method of construction.

Further, construction of rail lines, stations, and facilities incidental to construction of same pursuant to Public Utilities Code section 30631, as here, involve extremely nuanced site-specific conditions and studies, and a multitude of factors relevant to choosing the methods of construction; it is quite an unfair expectation and burden on our Legislature to foresee and anticipate all of the foregoing in order to expressly define/specify various "manners of construction" of rail lines and stations that qualify under the statute.

The burdens complained of by appellant (noise, dust, and access limitation) are unavoidable byproducts of the statutorily authorized acts, i.e., "by the plainest and most necessary implication from the powers expressly conferred" (*Hassell*, *supra*, 11 Cal.2d at p. 171). (See, e.g., *Friends of H Street*, *supra*, 20 Cal.App.4th at p. 162; *Orpheum*, *supra*, 80 Cal.App.3d at pp. 875–876.) This is not like *Jones v. Union Pacific Railroad Co.* (2000) 79 Cal.App.4th 1053 (*Jones*), where railroad employees

allegedly were "needlessly blowing train horns and whistles and idling train engines in front of property owners' homes for hours on end, at all hours of the day and night, for no legitimate purpose." (*Id*. at pp. 1066–1067, italics omitted.) The reviewing court found section 3482 did not apply because the activity in question was not expressly authorized by statute; the conduct described constituted "allegedly unnecessary activity, serving no legitimate purpose, and/or activity allegedly committed for the sole purpose of harassing plaintiffs." (*Id*. at p. 1068.) The same cannot be said for the *unavoidable* noise and traffic delays caused by respondents' construction of the Project described in the 4AC.

Appellant next argues section 3482 does not bar its nuisance claim because the 4AC "[a]t the very least . . . alleged whether such alternative, less intrusive methods of construction should have been used since Metro itself had committed to using them." According to appellant, the 4AC alleged: "Metro violated construction-related restrictions to which it had agreed pursuant to its mitigation obligations under the [Mitigation MRP], in order to demonstrate that Metro itself had acknowledged that there were approved alternative, feasible methods of construction available."

The less intrusive, alternative method of construction referenced in the 4AC refer to the use of TBM. As already discussed, this court has ruled in a prior action brought by appellant that excavation by TBM was not a feasible alternative to cut-and-cover construction in that area of the Project. (See *Today's IV, Inc. v. Los Angeles County Metropolitan Transportation Authority*, *supra*, B260855.) Appellant is barred from relitigating this issue. (See *Lucido*, *supra*, 51 Cal.3d at p. 341.)

As for the mitigation measures adopted in the Mitigation MRP and final EIR, appellant points to no authority or case to support its argument that Metro's (alleged) failure to utilize mitigation measures to mitigate construction impacts ipso facto qualifies Metro's manner of constructing the Project to a nuisance. Appellant references to its allegation in the 4AC that Metro failed to prepare or provide to appellant a TMP prior to commencing construction; they argue this amounted to violations of mitigation measures TR-1 and CN-3. However, we are hard pressed to find that an alleged failure to timely implement a mitigation measure amounts to a nuisance, or alternatively, removes Metro from the protection/immunity via section 3482. We do not agree with appellant's perspective—Metro did not forfeit its right to invoke section 3482 immunity because of its (alleged) failure to adequately implement mitigation measures discussed in the final EIR.

The statute then necessarily authorizes the accompanying noise and impaired access that major public construction projects typically create. (See *Friends of H Street*, *supra*, 20 Cal.App.4th at p. 162 ["The California courts have consistently held alleged nuisances arising from the construction, operation and maintenance of streets and highways to be within the protection of [Civil Code] section 3482"].) "Although the relevant statutes do not expressly authorize the City to operate its streets in a manner which generates traffic, noise, fumes, litter, and headlight glare, . . . such loss of peace and quiet is a fact of urban life which must be endured by all who live in the vicinity of freeways, highways, and city streets." (*Id*. at pp. 162–163.) Again, the allegations of nuisance complained of by appellant (noise, interference with access, and traffic delays) are in stark

contrast to the intrusions complained of in *Jones* ("needlessly blowing train horns and whistles and idling train engines in front of property owners' homes for hours on end, at all hours of the day and night, for no legitimate purpose"). (*Jones*, *supra*, 79 Cal.App.4th at pp. 1066–1067.)

In *Orpheum*, a property owner asserted a nuisance claim based on the noise, dust, and impaired view caused by the construction of an underground rail station. (*Orpheum*, *supra*, 80 Cal.App.3d at p. 866.) The Court of Appeal affirmed nonsuit of the nuisance action for noise, dust, fumes, and loss of view from the construction of an underground rail station, based on section 3482 and Public Utilities Code section 29031, which provided statutory authority "to construct any and all facilities necessary or convenient for rapid transit service and use public streets for this purpose"; there was no basis for nuisance liability due to the exculpatory effect of section 3482. (*Orpheum*, at pp. 875–876.) As it relates to the case before us, the protection offered to Metro via Public Utilities Code section 30631 should be identical to the protection offered the transportation agency in *Orpheum* via Public Utilities Code section 29031.

We have now identified two different overarching grounds on which we affirm the order granting respondents' motions for judgment on the pleadings—namely, 1) the 4AC fails to state facts sufficient to constitute a claim for nuisance, and 2) the 4AC pleads facts that allows for the application of statutory immunity via section 3482 from nuisance liability. We briefly address and dispense with the third ground argued on appeal.

Appellant contends the trial court "improperly relied on the existence of a CEQA exemption in applying section 3482" and that appellant was "not basing its claim [of unreasonable

58

construction methods] on the fact that [respondents'] conduct was or was not in violation of CEQA." Appellant argues "whether there was a CEQA analysis exemption is beside the point." We agree. Regardless of the trial court's reasons underlying its order, we performed an independent review and determined that the 4AC did not adequately state a nuisance claim and that the claim as stated was barred via section 3482. Had appellant wished to pursue the issue of CEQA application, exemptions, and/or violations, appellant should have briefed on appeal its challenge to the trial court's resolution of the cause of action for declaratory relief against respondents. It seems counterintuitive to argue the application of or exemption to CEQA (a state environmental protection statute) for purposes of seeking damages for a nuisance claim. (See *Hecton v. People ex rel. Dept. of Transportation* (1976) 58 Cal.App.3d 653, 656 ["For their claim in tort, plaintiffs concede the . . . state environmental protection statutes . . . [(CEQA)] in themselves create no cause of action for damages for violation of [its] provisions"].)

Finally, appellant does not contend in its brief on appeal that the trial court abused its discretion in granting Metro's and RCC's motions for judgment on the pleadings *without leave to amend*. While respondents argue appellant should not be granted leave to amend "as any attempt to do so would be futile," appellant proffered no counter in its reply brief. Accordingly, appellant has forfeited any challenge to those orders included in the properly entered judgments in Metro's and RCC's favor. (See *Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 729, fn. 1 [issue not raised on appeal deemed forfeited or waived]; *Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177–1178 ["Generally, appellants forfeit

or abandon contentions of error regarding the dismissal of a cause of action by failing to raise or address the contentions in their briefs on appeal"].)

C.    *Appeal from Order Granting Summary Adjudication of the 4AC's Nuisance Cause of Action in Favor of RCC*

The trial court granted summary adjudication of the nuisance cause of action in favor of RCC. Appellant contends this was error.

We disagree and affirm.

### 1.    Underlying Motion and Ruling

On September 20, 2019, RCC filed its motion for summary adjudication pursuant to Code of Civil Procedure section 437c, subdivision (f)(1). RCC argued the 4AC's nuisance cause of action is barred by section 3482, because that statute provides immunity to RCC's conduct that Today's IV asserts is a nuisance. RCC was authorized by Public Utilities Code sections 30631 and 130242 to complete the Project. RCC argued that "the types of alleged nuisances claimed here, such as noise, vibration, dirt, and dust, are unfortunate but innate features of temporary, transportation-related public works projects that Civil Code section 3482 deems not to be actionable nuisances." RCC contends Today's IV cannot show a triable issue of material fact that respondents conspired to spite, punish, or harm Today's IV.

In support, RCC submitted the declarations of Michael Aparicio, the executive vice president of Skanska (a member of the joint venture RCC); Gregory Zwiep, the vice president of operation of Skanska; and Cela Gallagher, the lead area manager of Skanska. RCC also submitted additional evidence in the form of deposition testimony. Today's IV had designated three

60

"persons most qualified" (PMQ) to testify on the alleged conspiracy between RCC and Metro to harm Today's IV: Michael Czarcinski, the former managing director of the Bonaventure; Peter Zen, owner of the Bonaventure; and Bonny Kirin-Perez, the director of operations at the Bonaventure. RCC argued, however, that "[n]one provided evidence that would create a material question of fact about the purported existence of a conspiracy."

On November 26, 2019, Today's IV filed its opposition to RCC's motion for summary adjudication. In support, Today's IV submitted a "Compendium of Evidence" totaling 3,167 pages of exhibits to the court (and us). We review the evidence relevant to purposes of this appeal.

Metro's contract (C0980) with RCC entitled the Project's "General Requirements – Division 01" dated January 7, 2013, provides the "allowable construction site noise levels" based on land use. The daytime eight-hour Leq noise limits provided in Metro's C0980 contract are: 80 dBA for residential land use; 85 dBA for commercial land use; and 90 dBA for industrial land use. The nighttime eight-hour Leq noise limit was set at the "ambient" level for the location plus 5 dBA. The noise limits for daytime eight-hour Leq set forth in the contract are identical to those required by the FTA.

Metro's C0980 contract required a "Noise Monitoring Plan [be] prepared and administered by [RCC's] Acoustical Engineer." The noise monitoring plan must provide "the nighttime and daytime construction activities, monitoring locations, equipment, procedures, schedule of measurements and reporting methods to be used." The contract further specified, "[i]n the event that the measured noise levels exceed allowable limits, immediately notify

Metro . . . and immediately implement additional Noise Abatement Measures."

RCC hired subcontractor Kroner Environmental Services, Inc. (Kroner) to provide "acoustical engineering services for RCC." Kroner prepared and submitted to Metro a "Project Noise Control Plan" dated March 16, 2015 on behalf of RCC. It specified that "both daytime and nighttime noise level limits are . . . *based upon the land usage and zoning*." (Italics added.) It also specified the construction Leq daytime noise limit is 85 dBA for construction on Flower Street (i.e., where the Bonaventure is located). In an updated "Project Noise Control Plan" dated February 1, 2017, Kroner provided that the "30-day average Leq during daytime and nighttime were 75 and 72 dBA, respectively" and "proposed daytime and nighttime construction noise limits at . . . 85 and 77 dBA, respectively."

Kroner prepared numerous reports in March 2016 based on its "noise monitoring on the sidewalk adjacent to the main entrance" of the Bonaventure. The reports provide Kroner measured noise levels between 77.2 and 77.6 dBA, between 79.9 and 80.2 dBA, and at 82.0 dBA—all of which are "less than the limit of 85 dBA as Leq."

During the November 6, 2019 deposition of Kurt Kroner, when asked about the "basis for deciding that [the Flower Street location] should be classified as commercial and not residential," he answered: "Because the . . . businesses along . . . that alignment were commercial as well as the zoning. It was zoned as commercial by City of Los Angeles." When asked what was Kroner's "basis for concluding that the Bonaventure Hotel was not a residential land use," he answered: "The fact that the hotel is included in a commercial zone."

62

On January 24, 2020, the trial court issued its final ruling granting RCC's motion for summary adjudication against the nuisance cause of action. It found the "statutory immunity provided by Civil Code section 3482 applies and bars [Today's IV's] nuisance claim." "Public policy requires that the Court administer a statutory immunity to provide its fullest benefits to a public agency engaged in a public construction . . . . [Today's IV] does not show a basis to not apply the immunity provided by section 3482 to" the Project.

The court explained: Today's IV's "interpretation would impose burdens on the statutory immunity that would undermine its purposes. The Court's view is that [Today's IV's] argument, under the present circumstances, is contrary to the purpose of the section 3482 and especially because the injuries complained of were the normal consequences of a public construction in a metropolitan area and were temporary." The court further held "if the burdens are temporary, occurring only when the public project is under construction, a landowner is required to bear the burden for the greater public benefit." The burdens from tunnel construction, i.e., noise, lights (for nighttime work), dirt and access limitation, were "temporary and are typical for major transit construction projects."

The court referred to noise reports made during the street-level work for cut-and-cover construction submitted by Today's IV, together with their expert declarations, "to argue that the noise levels during the construction exceeded [FTA] standards for limited time periods." The court found this "irrelevant to the point of [RCC's] motion" and found Today's IV's opposition "is, in fact, a new evidentiary motion in which [Today's IV] seeks to change the subject by arguing that RCC's construction was

63

unreasonable."  Today's IV "did not oppose RCC's motion for summary adjudication on its merits" and, instead, "used its opportunity to put before the Court a mass of noise reports (three binders worth), together with expert declarations, to argue that RCC's construction methodology was 'unreasonable' and therefore is not entitled to the immunity given by section 3482."

2.    Standard of Review

We review an appeal from the grant of a motion for summary adjudication de novo.  (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 385.)
In reviewing that order, we apply the same standards we apply in reviewing a trial court's order granting a motion for summary judgment.  (Code Civ. Proc., § 437c, subds. (c) & (f); *Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1471.)

"A party may move for summary adjudication as to one or more causes of action within an action . . . if that party contends that the cause of action no merit. . . .  A motion for summary adjudication shall be granted only if it completely disposes of a cause of action."  (Code Civ. Proc., § 437c, subd. (f)(1).)
"The purpose of the has law of summary judgment [and summary adjudication] is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

During our de novo review of an appeal from the grant of a motion for summary adjudication, we " 'consider[] all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports.' " (*Citizens for Odor*

64

*Nuisance Abatement v. City of San Diego* (2017) 8 Cal.App.5th 350, 357–358 (*Citizens*).)  We examine the record to determine whether triable issues of material fact exist and "consider[] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained."  (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65–66.)

The moving defendant bears the initial burden of showing the court that the plaintiff has not established, and cannot reasonably expect to establish, a prima facie case.  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)  To meet that burden, the moving defendant need only show the plaintiff cannot establish an essential element of a cause of action or that there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (o)(1) & (2); *Citizens*, *supra*, 8 Cal.App.5th at p. 357.)

If the moving defendant meets that initial burden, the burden then shifts to the plaintiff to show the existence of a triable material issue of fact; to meet that burden, the plaintiff cannot rely on the mere allegations of its pleadings that are conclusory, argumentative, or based on conjecture and speculation, but rather is required to make an independent showing by a proper declaration or by reference to a discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact.  (*Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1404; see *Citizens*, *supra*, 8 Cal.App.5th at p. 357; see *Aguilar*, *supra*, 25 Cal.4th at pp. 849–850.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in

65

accordance with the applicable standard of proof." (*Aguilar*, at p. 850, fn. omitted.)

3. Analysis

RCC argues appellant's nuisance claim is barred by section 3482, as it provides immunity via Public Utilities Code section 30631 to RCC's conduct and construction that appellant asserts is a nuisance. As already discussed, Public Utilities Code section 30631 grants authority to maintain and improve a rapid transit service, like construction of the Project. Per RCC, the undisputed evidence establishes that the aspects complained of by appellant are inescapable and necessary byproducts of the statutorily authorized acts. In other words, they are authorized "by the plainest and most necessary implication from the powers expressly conferred." (*Hassell*, *supra*, 11 Cal.2d at p. 171.)

Appellant raises the same arguments against application of section 3482 that it already raised in its appeal of the order granting respondents' MJOPs, which we addressed above. Appellant argues the manner of construction was unreasonable, such that the statutory immunity against civil liability under section 3482 cannot be invoked. (See *Venuto*, *supra*, 22 Cal.App.3d at p. 129 [§ 3482 is qualified by the condition that "although an activity authorized by statute cannot be a nuisance, *the manner in which the activity is performed may constitute a nuisance*"], italics added.) However, we already addressed that argument above by implementing the *Hassell* test, i.e., a particularized assessment of the authorizing statute in relation to the act which constitutes the nuisance (*Friends of H Street*, *supra*, 20 Cal.App.4th at pp. 160–161; *Varjabedian*, *supra*, 20 Cal.3d at p. 291, fn. 6), and finding the statute necessarily authorizes the accompanying noise and impaired access that

66

major public construction projects typically create. "Although the relevant statutes do not expressly authorize the City to operate its streets in a manner which generates traffic, noise, fumes, litter, and headlight glare, . . . such loss of peace and quiet is a fact of urban life which must be endured by all who live in the vicinity of freeways, highways, and city streets." (*Friends of H Street*, at pp. 162–163.)

Thus, the burden then shifts to the plaintiff (here, appellant) to show the existence of a triable issue of material fact.

Appellant contends "that, in opposition to summary adjudication, it submitted ample evidence" that created a triable/disputed issue of fact as to whether "the *construction methods selected by RCC*" were reasonable because they "caused significant disruption of the operation of [the Bonaventure] and that there were alternative methods of construction which RCC had actually agreed to use and which would have been far less disruptive." (Italics added.)

Appellant discusses many different aspects/manners of RCC's construction methods.

First, as to whether the construction method, i.e., RCC's decision not to opt "full temporary closure for 8 weeks, which would have shortened construction up to 3 months, and saved taxpayers $20M," was unreasonable, the evidence does not create a triable issue of fact. Appellant presented no evidence showing how the $20 million sum was reached and no evidence as to the pros and cons of "full temporary closure for eight weeks." The evidentiary record is silent on this point. With no evidence, we are unable to find appellant demonstrated a material issue of fact as to same.

Second, appellant argues it created a triable issue of material fact as to the reasonableness of RCC's methods of construction by submitting ample evidence of RCC's "manipulating sound standards and misclassifying" the Bonaventure as "commercial" use when it is residential use per the EIR and FTA.

Metro's contract C0980 with RCC stated the allowable daytime eight-hour Leq noise limits at 80 dBA for residential land use and 85 dBA for commercial land use. Contract C0980 required a noise monitoring plan to be prepared and administered by RCC's acoustical engineer. The evidence shows RCC hired Kroner to perform acoustical services.

The evidence includes copies of multiple "Project Noise Control Plan(s)" prepared by Kroner. One such Project Noise Control Plan specified that daytime "noise level limits are . . . *based upon the land usage and zoning*." (Italics added.) Thus, Kroner's Project Noise Control Plan set the construction Leq daytime noise limit at 85 dBA for construction in the Project area on Flower Street. Kurt Kroner's November 6, 2019 deposition testimony provides Kroner's "basis for deciding [the Flower Street location] should be classified as commercial and not residential" was "[b]ecause the . . . businesses along . . . that alignment were commercial as well as the zoning. It was zoned as commercial by City of Los Angeles." Kroner's "basis for concluding that the Bonaventure Hotel was not a residential land use," was due to the "fact that the hotel is included in a commercial zone."

Appellant argues the foregoing establishes RCC avoided complying with its contract with Metro, by changing the noise level limits originally set for the Project area near the Bonaventure from 80 dBA (per Metro's contract C0980 and the

68

EIR) to 85 dBA (per RCC's subcontractor Kroner). Appellant argues this "manipulation of sound standards" and "misclassifying" the Bonaventure's land use created a triable issue of material fact as to whether RCC's manner/method of construction was reasonable.

We disagree. Whether or not RCC's method of construction of the rail lines is reasonable in the context of appellant's claim for nuisance does not hinge on whether RCC possibly breached a term of its contract C0980 with Metro, in connection with its subcontractor Kroner's classification of noise limits in residential vs. commercial land use areas in the Project. It seems as though appellant is interpreting and attempting to enforce various terms of the contract based on what appellant views as breaches of that contract—breaches which allegedly result in nuisance to its hotel; this, despite the fact that appellant is neither a party nor a third party beneficiary to the contract. This is too far-fetched.

Third and finally, appellant argues it submitted evidence that specific construction methods/techniques were chosen and undertaken as a result of a conspiracy by respondents to provide preferential treatment to CNP because of Metro's "secret" agreement with CNP/FSP; per appellant, this creates a triable issue as to whether the construction methods were unreasonable.

The evidence, however, does not show RCC colluded with Metro to shift the bulk of its work to nighttime and weekends in order to retaliate against the Bonaventure and for an improper purpose, i.e., due to the terms of the settlement agreement between Metro and CNP/FSP. Nowhere in the settlement agreement does it specify that Metro's subcontractor RCC (who is not a signed party to the agreement) must only perform work on weekends and at nights. Despite our detailed review of the

69

voluminous compendium of evidence submitted by appellant as part of the record, there is no evidence of collusion by RCC with Metro for the purpose of effectuating the terms of Metro's settlement agreement with CNP/FSP.

Indeed, the evidence submitted on the issue by RCC demonstrated the opposite. The declaration of project director and senior vice president of operations of Skanska, Michael Smithson, who attended portions of several meetings between Metro and CNP on the construction of the Project, stated RCC's decision to conduct work at night adjacent to the Bonaventure "was not the result of any purported agreement with Metro to favor [CNP]." He stated he "would be aware of any agreement . . . between RCC and Metro" to harm or commit nuisance against Today's IV, and stated "[a]t no time did RCC make any [such] agreement." He also stated RCC's decision to conduct work at night adjacent to the Bonaventure "was not the result of any purported agreement with Metro to favor [CNP]."

RCC also provided the declaration of Gregory Zwiep of Skanska, who provided in his "capacity as Vice President of Operations and as Project Executive, [he] would be aware of any agreement, express or otherwise, between RCC and Metro to spite, punish, or harm [Today's IV]." RCC "did not agree to conceal the contents of any agreement between Metro and [CNP]." He also stated RCC did not abandon mitigation measures that were adopted, and "certainly did not abandon mitigation measures pursuant to a purported agreement with Metro to spite [Today's IV]." The declaration of Cela Gallagher similarly provided in her "capacity as Project Engineer and Lead Area Manager, [she] would [have] be[en] aware of any agreement

70

. . . between RCC and Metro to spite, punish, or harm Today's IV."

Of significance, in the July 2, 2019 deposition testimony of appellant's designated PMQ on the alleged conspiracy, Peter Zen, when asked on what grounds or evidence he believed that respondents conspired to harm the Bonaventure, he answered: "I believe . . . by the mere fact that [respondents] did not comply to the [Mitigation MRP] and the traffic management [plan] and asked for variances on noise, whereas, before they said they didn't need any, it is already enough evidence for me that, you know, they're out to not mitigate properly [which is] harming the Bonaventure." This does not constitute evidence of the existence of a conspiracy between respondents to improperly shift work to retaliate against the Bonaventure.

Similarly, during the April 3, 2019 deposition of Michael Czarcinski, the former managing director of the Bonaventure and appellant's other designated PMQ, he opined respondents conspired to harm the Bonaventure, and based his opinion "upon project changes" such as "[t]raffic patterns [and] time of work" and RCC/Metro "making deals with other stakeholders that were inconsistent with anything that was done for the [Bonaventure]." He believed Metro "basically settled with [CNP] to get them out of litigation to properly perform and build the [Project]" and "just settled with [CNP] and totally neglected the [Bonaventure]." Czarcinski's opinion consists of many speculations, none supported by the evidence before us.

We also note that while appellant refers to the agreement between Metro and CNP's owner as the "secret" agreement, the existence of which was withheld from appellant, we note that the settlement agreement—dated June 30, 2015—was discussed by

71

and attached to appellant's counsel's letter—dated July 27, 2015—to Metro and FTA. Thus, appellant did have knowledge of the agreement, knowledge sufficient to draft a letter to discuss details pertaining to the agreement within a few weeks of the date on which the agreement was signed.

D.   *Appeal from Order Granting RCC's Motion to Strike*

Appellant argues the trial court "erroneously struck [the] prayer for punitive damages against RCC." We affirm the order.

### 1.   Underlying Motion and Ruling

On December 4, 2018, RCC filed a motion to strike portions of the 4AC related to appellant's request for punitive damages. RCC argued that a "claim for punitive damages must allege the required elements with specificity and particularity" but that the 4AC fails to allege specific facts showing RCC's conduct was "oppressive, fraudulent, or malicious, as opposed to simply reciting conclusory language to that effect."

On March 3, 2020, the trial court's order granting RCC's motion to strike was filed.

### 2.   Standard of Review

"The standard of review for an order on a motion to strike punitive damages allegations is de novo." (*Turman v. Turning Point of Central California, Inc.* (2010) 191 Cal.App.4th 53, 63 (*Turman*).) "In passing on the correctness of a ruling on a motion to strike, judges read allegations of a pleading subject to a motion to strike as a whole, all parts in their context, and assume their truth." (*Clauson v. Superior Court* (1998) 67 Cal.App.4th 1253, 1255.)

### 3. Applicable Law

"In order to state a prima facie claim for punitive damages, a complaint must set forth the elements as stated in the general punitive damage statute, Civil Code section 3294." (*Turman, supra*, 191 Cal.App.4th at p. 63.) Section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (§ 3294, subd. (a).)

The statute expressly defines the terms—malice, oppression, and conduct—for the purposes of determining the viability of the claim for punitive damages. Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (§ 3294, subd. (c)(1).) Oppression is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (§ 3294, subd. (c)(2).) Fraud is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (§ 3294, subd. (c)(3).)

In addition to the requirement that the operative complaint set forth the elements as stated in section 3294, it must include specific factual allegations showing that defendant's conduct was oppressive, fraudulent, or malicious to support a claim for punitive damages. (*Brousseau v. Jarrett* (1977) 73 Cal.App.3d

864, 872.)  Punitive damages may not be pleaded generally. (*Ibid*.)

### 4.    Analysis

Appellant's request for punitive damages was based on the 4AC's cause of action for nuisance.  Because we conclude judgment on the nuisance cause of action was properly entered in RCC's favor, we need not reach appellant's claim that the trial court erroneously granted RCC's motion to strike the prayer for punitive damages.  Punitive damages are merely incident to a cause of action, and can never constitute the basis thereof. (*Grieves v. Superior Court* (1984) 157 Cal.App.3d 159, 163–164; *Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 391; *James v. Public Finance Corp.* (1975) 47 Cal.App.3d 995, 1000–1001.)

## DISPOSITION

The May 15, 2020 judgment in favor of RCC and against Today's IV is affirmed.

The May 15, 2020 judgment in favor of Metro and against Today's IV is affirmed.

Respondents shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**

STRATTON, P. J.

We concur:

WILEY, J.

HARUTUNIAN, J.*

---

\* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.